# UNITED STATES AIR FORCE COURT OF CRIMINAL APPEALS

## UNITED STATES

**v.**

## Staff Sergeant ANDRE K. LEWIS
### United States Air Force

## ACM 38671

## 29 March 2016

Sentence adjudged 21 April 2014 by GCM convened at Misawa Air Base, Japan. Military Judge: Matthew Stoffel (sitting alone).

Approved Sentence: Dishonorable discharge, confinement for 6 years, forfeiture of all pay and allowances, and reduction to E-1.

Appellate Counsel for Appellant: Major Thomas A. Smith.

Appellate Counsel for the United States: Captain Tyler B. Musselman and Gerald R. Bruce, Esquire.

Before

ALLRED, TELLER, and ZIMMERMAN
Appellate Military Judges

OPINION OF THE COURT

This opinion is issued as an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 18.4.

TELLER, Senior Judge:

Appellant was convicted, contrary to his pleas, by a military judge sitting alone of making false official statements, aggravated sexual assault, aggravated sexual contact, abusive sexual contact, assault consummated by a battery, and adultery, in violation of Articles 107, 120, 128, and 134, UCMJ, 10 U.S.C. §§ 907, 920, 928, 934. The court sentenced him to a dishonorable discharge, confinement for 6 years, reduction to E-1, and forfeiture of all pay and allowances. The sentence was approved, as adjudged, on 1 September 2014.

Appellant argues that (1) his conviction for aggravated sexual assault of one victim is factually insufficient; (2) his convictions for abusive sexual contact, aggravated sexual contact, and assault consummated by a battery of a second victim (and the related false official statement conviction) are legally and factually insufficient; (3) the remaining conviction for false official statement is legally and factually insufficient; and (4) he was prejudiced by the re-assignment of a paralegal who assisted in his defense to the base legal office that prosecuted his case.[1] We find some merit in Appellant's factual sufficiency argument concerning the aggravated sexual contact conviction and modify the findings and reassess the sentence as described below. We affirm the remainder of the findings.

*Background*

Appellant was convicted of misconduct related to two separate incidents approximately 18 months apart. The first incident, which occurred in November 2011 as Appellant was preparing to leave Ramstein Air Base (AB), Germany, involved sexual acts with Staff Sergeant (SSgt) HP while she was substantially incapacitated. The second, which occurred on or about 13 April 2013 at Misawa AB, Japan, involved several charges related to unwanted sexual contact and battery of SSgt YM.[2]

*Germany Offenses*

There was substantial testimony about the interaction between Appellant and SSgt HP during the evening prior to the sexual misconduct in Germany. SSgt HP was part of a group of Airmen celebrating her birthday and a colleague's impending departure. Appellant had recently returned from a deployment. Appellant had originally planned to go out with a friend of his, SSgt MS, and a friend of SSgt MS, Mr. RZ. Prior to going out, Appellant parked his car at Mr. RZ's home. In an apparent coincidence, Appellant and SSgt HP ran into each other at a dance club off-base.

The evidence is compelling that SSgt HP became severely intoxicated while at the club. SSgt HP testified that she recalled dancing with Appellant for a few songs then going to sit down with a group of friends. After that, with the exception of two brief memories, she has no recollection of events until she woke up with Appellant at Mr. RZ's home. The two brief memories both involve sexual acts with Appellant which will be discussed in more detail below.

While there was no independent evidence of the circumstances surrounding Appellant's and SSgt HP's departure from the club, Appellant gave a description of the events to agents from the Air Force Office of Special Investigations (AFOSI). The

---

[1] The third and fourth assignments of error are raised pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982).

[2] Although Appellant was charged with sexual and other misconduct related to a third victim in 2012, he was acquitted of all of those charges.

written transcript of the interview and Appellant's written statement were admitted into evidence by the Government. Appellant told AFOSI that he noticed bouncers preparing to escort SSgt HP from the club because of her obvious intoxication and he decided to take her outside to get a taxi. Appellant could not find a taxi willing to take SSgt HP because of her state of drunkenness. At some point, SSgt HP also began to vomit, complicating efforts to convince a taxi to take her home. After his initial efforts to find a taxi for SSgt HP failed, Appellant went back into the club to persuade someone from SSgt HP's group of friends to take responsibility for her. According to Appellant, none of the friends he could find were amenable. Other witnesses who had accompanied SSgt HP to the club testified that they saw Appellant during this time and he did not ask them to help SSgt HP get home. Appellant told AFOSI that he then decided to get his belongings and get a taxi himself to take SSgt HP home. When Appellant left the club, SSgt HP was no longer in the parking lot, and a bouncer suggested he check the "drunk tent," a small shelter in the parking area to keep intoxicated patrons from being injured. Appellant found SSgt HP passed out in the drunk tent, and after about 40 minutes, finally found a taxi willing to take them. Appellant described the ride as "a bit of a ways" from the club and told agents that the taxi had to stop once during the trip for SSgt HP to step out to vomit. When they arrived at SSgt HP's home, Appellant did not just drop her off, but rather paid for the taxi and got out with SSgt HP. Shortly thereafter, Appellant discovered that SSgt HP did not have her keys. Although SSgt HP easily got in the next day through a partially barred door, she was unable to do so that night and Appellant had no way of getting SSgt HP into the house. Appellant took SSgt HP to the partially open garage and set out a tarp for her to lie down on while he tried to arrange for a ride to Mr. RZ's house.

There is scant evidence of what time Appellant and SSgt HP had left the club. One witness estimated that she arrived with SSgt HP at 0115, stayed for two or three hours, and saw Appellant picking up his coat as she was leaving the club. By her estimate, that would have been approximately 0415. Appellant's cell phone showed a text from Appellant to SSgt MS at 0458, apologizing for leaving the club without him, but making no mention of needing to be picked up from SSgt HP's home. Appellant sent another text message to SSgt MS at 0502 describing SSgt HP as "almost dead." Less than 10 minutes later, Appellant sent a text to SSgt MS, asking him to send a taxi to SSgt HP's home to pick him up. His cell phone memory also indicated several phone calls and texts from 0506 to at least 0600 that are consistent with Appellant's account of the time he spent in the garage of SSgt HP's home.

Appellant was eventually successful in getting his friends to pick them up from SSgt HP's house. Around 0600, SSgt MS and Mr. RZ arrived at SSgt HP's home in a taxi to take Appellant and SSgt HP to Mr. RZ's house. While Appellant's friends testified that SSgt HP was lucid when she arrived at the house, the evidence of bias and lack of candor with law enforcement render that testimony unworthy of belief.

The primary evidence relating to the charged sexual acts comes from Appellant, although SSgt HP testified about two "flashes" of memory. According to Appellant, SSgt HP lay down on the guest room futon, and rather than joining her, he lay down on the floor. After about 30 minutes, he asserts, she verbally invited him to have sex with her, but he demurred. After 10 minutes, he decided to check on her, and she pulled him onto the futon by his belt. According to Appellant, despite her intoxication to the point of passing out when they left the club, SSgt HP had recovered enough to become the sexual aggressor. His version of events describing himself as reluctantly acceding to her sexual advances was unconvincing in light of the evidence of her state of intoxication just hours earlier. SSgt HP testified that she had only two brief recollections between sitting down at the club and waking up the next morning late for work. The first memory started with her being "face down" on a bed with a person who she later identified as Appellant penetrating her from behind. When asked to describe her position more fully, she testified,

> [SSgt HP:] Um, I was, yeah I was face down. Um, I came from my face up, up from the bed, him, to look behind me [the witness waived her left hand up]. Um, my, um, my legs were hanging over the edge of the bed. Um, my knees, well, my knees were at the edge of the bed.
>
> [Trial Counsel:] And where were your stomach and chest with respect to the bed?
>
> [SSgt HP:] I'm not 100% sure. I pushed up and looked back.
>
> [Trial Counsel:] Did you—how long do you—how long was this piece of memory that you have?
>
> [SSgt HP:] Seconds.

SSgt HP's next recollection was being in the shower with Appellant, but she did not recall any sexual acts during that brief memory.

The next morning, Appellant took SSgt HP to work, where the allegations came to light. Appellant woke SSgt HP up at approximately 1100 because he knew she was scheduled to work. He drove her to her house, where she entered through the partially barred door and changed into her uniform. Appellant then drove her to work. After contacting some friends who were at the club with her, she spoke to her supervisor. She told him that she had become intoxicated, that she remembered Appellant penetrating her, and that she had not wanted that to happen. The incident was investigated by AFOSI. During the investigation Appellant made specific statements of fact about interactions he had with SSgt HP's friends at the club that, according to the testimony of these individuals, did not occur. No action was taken against Appellant at that time.

ACM 38671

*Japan Offenses*

The evidence surrounding Appellant's offenses in Japan is more complete. Unlike the offenses in Germany, this victim's intoxication did not impair her memory, and she testified fully about Appellant's conduct.

Appellant arrived at Misawa AB, Japan, in March 2013 and soon became friends with the victim, SSgt YM. SSgt YM served as Appellant's informal sponsor when he first arrived, and they worked together on the same shift in one of the base dining facilities. Although SSgt YM was in a relationship with Sergeant First Class (SFC) JJ, she and Appellant were good friends and often socialized together.

On 12 April 2013, after a night of drinks and dancing, Appellant and SSgt YM got a suite in on-base lodging. Originally, SSgt YM planned to go out with SFC JJ and perhaps some others to have some drinks. Ultimately SFC JJ was unable to go out because of his duties. Appellant agreed to go out with SSgt YM, but no one else wanted to join them. The two went to a few different bars, ending up at the on-base club, where Appellant tried to teach SSgt YM salsa dancing. While both Appellant and SSgt YM were drinking, neither was substantially intoxicated. A base curfew policy required Airmen in the rank of SSgt or below to be either on base or in their residence by midnight. It was not unusual for non-commissioned officers subject to the curfew who lived off base to get a room at the on-base lodging facility so they could spend the night on base after going to the club. SSgt YM agreed to get a two-room suite at lodging, planning for her to spend the night in the bedroom and for Appellant to sleep on the sofa in the living room.

The evidence conflicts concerning what happened after the two arrived at lodging. SSgt YM testified as to her recollection of events, and Appellant made statements about the events which were later admitted into evidence. According to both accounts, SSgt YM was disappointed and angry that SFC JJ did not make it a priority to come out with her that night.

SSgt YM testified that as soon as they got in the elevator, Appellant unexpectedly put his arms around her from behind with a "pretty firm grip." Although she testified that she did not want him to place his arms around her and was hoping he would let go, she did not say anything to him. After they got in the room, Appellant removed his arms and SSgt YM sat down in an upholstered chair. Appellant pulled a table next to SSgt YM and began to aggressively ask her if she would have sex with him. SSgt YM testified that she told him no. SSgt YM described how Appellant would use his hand to turn her face back towards him whenever she looked away. SSgt YM testified that he then began to ask her just to kiss him; "[h]e grabbed my, he grabbed my head along my jaw and chin, and he pulled my face towards his and told me to kiss him, and he pressed my face up against his." She testified about her perception of the force used by Appellant.

ACM 38671

[Trial Counsel:] What level of force was he using at that particular point?

[SSgt YM:] Um, he was very aggressive. If I were to try to get away, I wouldn't have been able to.

[Trial Counsel:] What makes you say that you wouldn't have been able to get away from him?

[SSgt YM:] I remember the grip on my face being very tight. And if I tried to turn my head, he would turn it back towards his.

[Trial Counsel:] Did he actually succeed in kissing you while he was doing this?

[SSgt YM:] Yes, ma'am.

[Trial Counsel:] What was your reaction when he was doing this to you?

[SSgt YM:] I was scared.

[Trial Counsel:] Can you go into more detail about why you were scared?

[SSgt YM:] Um, I was in shock that it was happening, and I didn't know what to do right at that moment. I was afraid that if I tried to get away, that something was going to happen to me.

[Trial Counsel:] When you say something was going to happen to you, what you mean by that?

[SSgt YM:] Um, with the way he was being aggressive, I didn't know what else could happen. Not necessarily that he was going to try to hit me, but I didn't know what was going to happen.

[Trial Counsel:] Did you kiss him back at any point?

[SSgt YM:] Yes, ma'am. I did.

[Trial Counsel:] And why did you kiss him back?

[SSgt YM:]   I thought that if I kissed him back, he would leave me alone.

SSgt YM testified that during this time Appellant also touched her breasts.  She testified that while Appellant was kissing her, and she continued to protest, Appellant placed his hands down the front of her shirt and touched her breasts, although she could not recall whether it was directly or through her clothing.

[Trial Counsel:]   When he put his hands down your shirt, what exactly did he touch?

[SSgt YM:]   He touched my breasts.

[Trial Counsel:]   Did he touch your breasts through—did he actually touch the skin of your breasts, or was he just touching some article of clothing?

[SSgt YM:]   I don't remember.

[Trial Counsel:]   Could you feel his hands actually touching your breasts?

[SSgt YM:]   I remember feeling them touch the top of my chest, but I don't remember if they touched my actual—the lower part of my breasts.

[Trial Counsel:]   Is it fair to say he was touching the upper parts of your breasts?

[SSgt YM:]:  Yes, ma'am.

She described the level of force used to touch her breasts as "maybe a three or four" on a scale of one to ten.  She successfully pushed his hands away.  She also testified that Appellant removed his shirt and "grabbed [her] hands and put them on his chest, and he also made [her] kiss his chest."  She described the level of force he used as a seven out of ten, and stated that she was unable to pull her hands away.  SSgt YM testified that after he tried unsuccessfully to get her to kiss him, Appellant asked if he should get a separate room.  When she replied that he should, Appellant left.

After Appellant left the room, SSgt YM exchanged a series of calls and instant messages with SFC JJ.  SSgt YM asked him to come to the room, but SFC JJ initially declined.  In one message, she told SFC JJ, "I OBVIOUSLY NEED U [sic] HERE."  She explained the lack of any specific reference to Appellant's conduct as an attempt to avoid making SFC JJ upset before he arrived, but said she wanted him there because she "was afraid" Appellant would come back.  The military judge later clarified with her that her

fear was not for her physical safety, but instead that Appellant "could have been more aggressive with trying to get [her] to have sex with him or kiss him."

Appellant did in fact return to SSgt YM's room about 20 minutes after he left. He knocked on the door, and SSgt YM, feeling "pretty sure" that it was Appellant, opened the door. SSgt YM testified that over the next three to four minutes Appellant resumed his entreaties to have a relationship with him, again using a force of about seven to bring her lips to his and bring her hands to his chest. She also recounted how he "in the same manner as before" placed his hands down her shirt. She described this interaction as occurring with her seated on the couch and Appellant kneeling in front of her. She further testified that after getting up to leave, Appellant again tried to pull her towards him to kiss him, and as she was trying to pull away, her arm came free and she hit herself in the mouth with her phone. Specifically, she said that he placed a hand around each of her wrists and tried to pull her towards him using a force of nine out of ten. She testified:

> [Trial Counsel:]  And so did he have one hand around each wrist?
>
> [SSgt YM:]  Yes, ma'am.
>
> [Trial Counsel:]  Were you holding anything in either of your hands?
>
> [SSgt YM:]  Yes, ma'am. I had my phone in my right hand.
>
> [Trial Counsel:]  And so can you describe how hard you were pulling away—trying to pull away from him?
>
> [SSgt YM:]  It—I would have to put a lot of force behind it.
>
> [Trial Counsel:]  How long would you say that he was holding her [sic] hands in that particular position?
>
> [SSgt YM:]  Just a few seconds.
>
> [Trial Counsel:]  How long did you have to pull away before you were successful?
>
> [SSgt YM:]  I'd say maybe 2 to 3 seconds.
>
> [Trial Counsel:]  Was it something—were you able to pull away right away or did it take some more effort?
>
> [SSgt YM:]  It took a little bit of effort.

[Trial Counsel:] What happened when—after you were successful in pulling away?

[SSgt YM:] I hit myself in the mouth with my phone, and once I realized I was bleeding, I went into the bathroom.

The military judge later followed up to attempt to clarify the degree of force used.

[Military Judge:] There were several times where trial counsel asked you how much force it was that Sergeant Lewis applied to you and you described it on a scale of 1 to 10. Can you tell me what one means and what 10 means?

[SSgt YM:] One would be if I could easily just roughly take my hands away. Ten is there is no way I could remove myself or no way I could remove myself from his grip.

[Military Judge:] So you had described that when he had his hands on your wrists trying to pull you towards him, you described that as about a force of a nine?

[SSgt YM:] Yes, sir.

[Military Judge:] So were you able to pull your hands away or did he let your hands go?

[SSgt YM:] I think it was probably a combination of the two. I remember still—I remember having to put a lot of force behind pulling my hands away, but I think he may have let me go at the same time.

[Military Judge:] So if I understand it you had to use a lot of force to pull away, but you think that at some point when he realized you were—really did not want his hands on your wrists that he then let go?

[SSgt YM:] Yes, sir.

[Military Judge:] And is that when your hands came back toward your face?

[SSgt YM:] Yes, sir.

On cross-examination, SSgt YM agreed that she never contended that Appellant intended for the phone to hit her mouth, and agreed the contact was accidental. SSgt YM

testified that after she went to the bathroom to check her injury, she and Appellant had a brief, heated conversation, and then Appellant left the room. SFC JJ arrived shortly afterwards, and after some discussion with SSgt YM, SFC JJ reported the incident to security forces.

The investigation was referred to AFOSI, who initiated a pretext phone call from SSgt YM to Appellant and then called Appellant in for an interview. In both the interview and the pretext phone call, Appellant contended that there was no contact beyond mutual kissing. He asserted that once they were in the room, the space between them "closed up" and they kissed. He told the agents that his hands were on SSgt YM's hips while they kissed. He told the agents that they first kissed near the door, then had a conversation about relationships as they sat down in the living area. He said SSgt YM got emotional talking about SFC JJ and they hugged, which led to another kiss. He stated after the kiss SSgt YM felt guilty, and he brought up again that he should get his own room. When asked if SSgt YM displayed any physical resistance, Appellant said after the second kiss they just stopped and that "there was no tug-of-war at all." Appellant did volunteer that he returned to SSgt YM's room after getting his own, but at first stated that they just talked during his second visit to the room. As the interview progressed, Appellant's account of the second visit changed, and Appellant told AFOSI that they kissed during the second visit as well. When asked if anything else happened during that visit, he told the agents that SSgt YM slipped off the arm of the chair where he was sitting and hit her mouth on his shoulder. The photos of the injury to SSgt YM's mouth admitted into evidence clearly show an injury to SSgt YM's gums above her teeth. During the pretext phone call, Appellant asked SSgt YM repeatedly not to tell anyone about the night's events.

*Factual Sufficiency—Aggravated Sexual Assault*

Appellant first argues that the evidence of aggravated sexual assault of SSgt HP was factually insufficient to sustain his conviction. We review issues of factual sufficiency de novo. *United States v. Beatty*, 64 M.J. 456, 459 (C.A.A.F. 2007). The test for factual sufficiency is "whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, [we are] convinced of the [appellant]'s guilt beyond a reasonable doubt." *United States v. Turner*, 25 M.J. 324, 325 (C.M.A. 1987), *quoted in United States v. Reed*, 54 M.J. 37, 41 (C.A.A.F. 2000). In conducting this unique appellate role, we take "a fresh, impartial look at the evidence," applying "neither a presumption of innocence nor a presumption of guilt" to "make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt." *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002). Our factual sufficiency determination is limited to a review of the entire record, meaning evidence presented at trial. *Reed*, 54 M.J. at 43; *United States v. Bethea*, 46 C.M.R. 223, 225 (C.M.A. 1973).

We have reviewed the record of trial and evaluated the arguments by Appellant and the Government. We have weighed the entire record of trial and have made allowances for not having heard and observed the witnesses. Given the totality of the circumstances, and in light of all of the evidence in this case, we are convinced beyond a reasonable doubt of Appellant's guilt of aggravated sexual assault of SSgt HP.

*Factual and Legal Sufficiency—Offenses Relating to SSgt YM*

Appellant next asserts that the evidence is factually and legally insufficient to support the convictions of the offenses relating to SSgt YM. Appellant was convicted of four offenses related to SSgt YM. First, he was convicted of making a false official statement to AFOSI concerning the source of SSgt YM's injury to her mouth. Second, he was convicted of abusive sexual contact[3] for touching SSgt YM's breast without permission. Third, he was convicted of aggravated sexual contact for causing SSgt YM to touch his chest with her hands and lips by using unlawful force, specifically physical strength sufficient that she could not avoid or escape the sexual contact. Finally, Appellant was convicted of assault consummated by a battery for unlawfully restraining her by her wrists. Appellant contends that the evidence was legally insufficient as to the abusive sexual contact offense because "there was no evidence elicited at trial that Appellant touched SSgt YM's breast through her clothing." He also asserts that the evidence was factually insufficient with regard to the other offenses "because SSgt YM is not credible and had a motive to fabricate the allegations against Appellant." We apply the same standard with regard to factual sufficiency as articulated above. We review the legally sufficiency of the evidence de novo. *Beatty*, 64 M.J. at 459.

"The test for legal sufficiency of the evidence is 'whether, considering the evidence in the light most favorable to the prosecution, a reasonable factfinder could have found all the essential elements beyond a reasonable doubt.'" *United States v. Humpherys*, 57 M.J. 83, 94 (C.A.A.F. 2002) (quoting *Turner*, 25 M.J. at 324). The term reasonable doubt does not mean that the evidence must be free from conflict. *United States v. Lips*, 22 M.J. 679, 684 (A.F.C.M.R.1986). "[I]n resolving questions of legal sufficiency, we are bound to draw every reasonable inference from the evidence of record in favor of the prosecution." *United States v. Barner*, 56 M.J. 131, 134 (C.A.A.F. 2001). Our assessment of legal and factual sufficiency is limited to the evidence produced at trial. *United States v. Dykes*, 38 M.J. 270, 272 (C.M.A. 1993).

We find the evidence of abusive sexual contact legally sufficient. Although SSgt YM did express uncertainty about whether Appellant touched her directly or through some article of clothing, her testimony was clear that Appellant touched her breast. While her uncertainty raised an issue about whether he touched all of her breast directly, or only some part of it, it never contradicted her initial assertion that Appellant touched

---

[3] Appellant was originally charged with aggravated sexual contact for this touching, but was convicted only of the lesser included offense.

her breast in some manner. Viewing this testimony in the light most favorable to the prosecution, we conclude that a reasonable finder of fact could have concluded beyond a reasonable doubt that Appellant touched some part of SSgt YM's breast through her clothing. We ourselves, after making allowances for not having seen the testimony, are also convinced beyond a reasonable doubt of Appellant's guilt of abusive sexual contact.

We are similarly convinced of Appellant's guilt beyond a reasonable doubt of the offenses of false official statement and assault consummated by a battery. The injury depicted in the photographs admitted into evidence is completely consistent with SSgt YM's account of Appellant's second visit to her room, and does not support either of the versions Appellant provided to AFOSI during his interview. SSgt YM testified that Appellant grabbed her wrists with unlawful force, and in the course of escaping from his grasp her cell phone struck her mouth and caused the injury to her gums. She also testified that she confronted Appellant, making him aware of the injury. We find that evidence factually sufficient to sustain his convictions.

We are not convinced beyond a reasonable doubt, however, of Appellant's guilt of the charged offense of aggravated sexual contact for causing SSgt YM to touch his chest with her hands and lips by using unlawful force. As alleged in Charge II, Specification 5, the Government was required to prove that Appellant used sufficient strength that SSgt YM could not avoid or escape touching Appellant's chest with her hands and lips. Several times during her testimony, the prosecution asked SSgt YM to characterize the level of force used by Appellant. In describing the level of force used to cause her to touch his chest, SSgt YM characterized it as a seven on a scale of ten. She also testified that she could not pull her hands away, but we weigh that testimony in conjunction with her behavior that night, including her willingness to let Appellant back into her room after he had departed. When the military judge later asked her how much force Appellant used in grasping her wrists in the context of the battery offense, she characterized the level of force as nine out of ten, but testified that she was able to pull away. In light of her conflicting testimony, we are not convinced beyond a reasonable doubt that Appellant did in fact use such strength that SSgt YM could not have avoided or escaped the contact. Despite determining the evidence was factually insufficient to sustain the charged offense, we may nonetheless affirm so much of the finding that includes a lesser included offense. Article 59(b), UCMJ, 10 U.S.C. § 859(b). We are convinced beyond a reasonable doubt that Appellant caused SSgt YM to touch his chest with her hands and lips without her consent, and accordingly affirm the conviction to the lesser included offense of abusive sexual contact.

*Factual and Legal Sufficiency—2011 False Official Statement*

Appellant, pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982), asserts that the evidence was factually and legally insufficient to sustain his conviction for the false official statement set out in Charge I, Specification 2. Appellant specifically

asserts that the evidence did not prove that he had the intent to deceive in making the statement, and that the evidence that the statement was false was unreliable. We apply the same standard for factual and legal sufficiency as set out above.

The assertion at issue is Appellant's statement that "[he] ran into a coworker [, SSgt BH,] and [he] asked [SSgt BH] to please help [him; SSgt BH] told [Appellant] [SSgt HP] was grown[,] going through a divorce[,] just take her home" or words to that effect. Appellant made this assertion both in his written statement and his verbal statement to AFOSI. The statement was made in the context of multiple assertions to AFOSI that Appellant had no preconceived intent to engage in sexual relations with SSgt HP, SSgt HP initiated the sexual contact, and he reluctantly acceded to her advances.

First, we find that a reasonable fact finder could have found beyond a reasonable doubt that no such verbal exchange took place between Appellant and the coworker, and we ourselves reach that conclusion beyond a reasonable doubt. The coworker testified at trial and unequivocally stated that no such conversation took place. The coworker, who had no apparent bias towards either party, recalled seeing Appellant as he was leaving the club. He testified that, contrary to Appellant's statement to AFOSI, Appellant affirmatively took responsibility for taking SSgt HP home. The coworker also recalled a brief exchange about the fact that SSgt HP's car was parked at the coworker's house, and that Appellant would make sure that she got it the next day. In light of the level of detail of the coworker's testimony and his lack of bias, we find his testimony both legally and factually sufficient to conclude that the verbal exchange asserted in Appellant's statements did not occur.

Second, since we have no direct evidence of Appellant's intent to deceive, we must determine whether, in light of all the evidence, one could reasonably infer such intent from the surrounding circumstances. The charged statement was completely consistent with Appellant's other assertions that he only reluctantly took SSgt HP home in the first place. While his theme of being a reluctant partner may have been of little relevance to the offense as ultimately charged, our inquiry must focus on his intent at the time of making the statement. Appellant's verbal and written statements contain numerous assertions that SSgt HP initiated the sexual contact that night. In light of his other statements, we are convinced beyond a reasonable doubt that Appellant intended AFOSI to believe that he tried to find an alternative to leaving the club with SSgt HP to corroborate his other statements that he did not initiate the sexual contact that night. We also find the evidence sufficient to allow a reasonable finder of fact to reach that conclusion beyond a reasonable doubt.

Viewing the evidence in the light most favorable to the Government, we find a reasonable fact finder could have found all the essential elements of the offense beyond a reasonable doubt. Similarly, having weighed the evidence in the record of trial, making

allowances for not having personally observed the witnesses, we ourselves are personally convinced of Appellant's guilt beyond a reasonable doubt.

*Reassignment of Defense Paralegal*

Appellant's final assignment of error, also submitted pursuant to *Grostefon*, asserts that his substantial rights were prejudiced when SSgt TG, the defense paralegal assigned to assist in his defense, was reassigned to the base legal office that was prosecuting him. In a declaration subject to penalty of perjury, Appellant makes two specific claims: first, that shortly after speaking with Appellant, SSgt TG "was removed [from] his position at the [area defense counsel's office] and began working on the government[']s behalf"; and second, he "believe[d] information stemming from [their] discussions [was] told to the Government to bring about more false and [inaccurate] charges." Appellant alleges the sharing of privileged information constituted prosecutorial misconduct and that "the appearance of transferring SSgt [TG] to the military justice section of the base legal office also raises a legitimate question regarding the fairness of Appellant's trial."

We review arguments of prosecutorial misconduct raised for the first time on appeal for plain error. *See United States v. Akbar*, 74 M.J. 364, 398 (C.A.A.F. 2015) (reviewing for plain error an allegation raised for the first time on appeal that the government's control over the defense counsels' assignments constituted prosecutorial misconduct and unlawful command influence). Appellant must show not only the underlying facts alleged to constitute misconduct, but also that it resulted in some "unfairness in the proceedings." *Id.* at 399. In this case, Appellant makes only the speculative claim that privileged material was shared.[4] Appellant does not identify any information that came out at trial that he believes was obtained from privileged discussions. In fact, a plain reading of the record indicates that all of the evidence and the identity of witnesses related to the offenses of which he was convicted were disclosed through the course of a routine investigation. Both victims filed complaints with law enforcement independently and cooperated with the investigation. Appellant also made statements to AFOSI. While we are cognizant of the difficulty Appellant faces in proving the content of conversations that may have occurred between SSgt TG and government personnel, we also recognize that one purpose of the plain error rule is to encourage such claims to be raised at trial so that the record can be fully developed. We find that Appellant failed to meet his burden to show any unfairness in the proceeding that resulted from SSgt TG's reassignment, and therefore find no plain error.

---

[4] We find that a fact-finding hearing on this issue pursuant to *United States v. DuBay*, 37 C.M.R. 411 (1967) is not necessary or appropriate. "[I]f [an] affidavit does not set forth specific facts but consists instead of speculative or conclusory observations, the claim may be rejected on that basis." *United States v. Ginn*, 47 M.J. 236, 248 (C.A.A.F. 1997). Since Appellant did not specify any information he believed was derived from privileged information, we find his claim to be speculative and conclusory. Although this court granted Appellee's motion to attach affidavits from legal office personnel pertaining to SSgt TG's involvement in the case, we did not consider them in reaching this decision.

*Sentence Reassessment*

Because we have reduced Appellant's degree of guilt to one of the sexual contact offenses, we must determine whether we can reassess the sentence, or whether we must order a rehearing. This court has "broad discretion" in deciding to reassess a sentence to cure error and in arriving at the reassessed sentence. *United States v. Winckelmann*, 73 M.J. 11, 12 (C.A.A.F. 2013). To reassess the sentence, we must be able to reliably conclude that, in the absence of error, the sentence "would have been at least of a certain magnitude," and the reassessed sentence must be "no greater than that which would have been imposed if the prejudicial error had not been committed." *United States v. Sales*, 22 M.J. 305, 307–08 (C.M.A. 1986). We must be able to determine this to a "degree of certainty." *United States v. Eversole*, 53 M.J. 132, 134 (C.A.A.F. 2000); *see also United States v. Taylor*, 51 M.J. 390, 391 (C.A.A.F. 1999) (holding we must be able to reach this conclusion "with confidence"). "The standard for reassessment is not what would be imposed at a rehearing but what would have been imposed at the original trial absent the error." *United States v. Taylor*, 47 M.J. 322, 325 (C.A.A.F. 1997); *see also United States v. Davis*, 48 M.J. 494, 495 (C.A.A.F. 1998) (holding no higher sentence than that which would have been imposed by the trial forum may be affirmed). A reassessed sentence "must be purged of prejudicial error and also must be 'appropriate' for the offense[s] involved" based on our sentence approval obligation under Article 66(c), UCMJ, 10 U.S.C. § 866(c). *Sales*, 22 M.J. at 308.

In determining whether to reassess a sentence or order a rehearing, we consider the totality of the circumstances, including the following illustrative, but not dispositive, factors: (1) dramatic changes in the penalty landscape and exposure, (2) the forum, (3) whether the remaining offenses capture the gravamen of the criminal conduct included within the original offenses, (4) whether significant or aggravating circumstances remain admissible and relevant, and (5) whether the remaining offenses are the type with which we as appellate judges have the experience and familiarity to reliably determine what sentence would have been imposed at trial by the sentencing authority. *Winckelmann*, 73 M.J. at 15–16.

Our modification of the findings did not substantially change Appellant's culpability in this case. Appellant remains convicted of sexual assault against a fellow Airman, two instances of abusive sexual contact against a second Airman, two false statements to investigators, and a battery that resulted in injury. The sentencing landscape has not changed significantly as a result of our decision, which generally weighs in favor of our ability to reassess the sentence. *See United States v. Riley*, 58 M.J. 305, 312 (C.A.A.F. 2003); *Winckelman*, 73 M.J. at 14. The remaining sexual misconduct captures the gravamen of the offenses, and the same conduct would have been before the military judge in sentencing. The offenses are of the type that we have experience and familiarity with as appellate judges, and the sentence was imposed by a military judge

rather than a panel. Considering the totality of the circumstances of this case, including the factors enumerated in *Winckelmann*, we are confident we can reassess the sentence.

Based on Appellant's conviction for aggravated sexual contact, as well as the offenses of which Appellant remains guilty, the military judge sentenced Appellant to a dishonorable discharge, confinement for 6 years, forfeiture of all pay and allowances, and reduction to E-1. In light of the factors discussed above, we conclude that we can reassess the sentence to the sentence adjudged. We are convinced that the military judge in this case imposed sentence based upon the facts and circumstances of the offenses and not the legal label associated with any one offense. We can confidently and reliably determine that, absent the error, the sentence adjudged by the military judge would have been the same.

*Conclusion*

We find the conviction for aggravated sexual contact alleged in Specification 5, Charge II, factually insufficient and approve the finding of guilt only of the lesser included offense of abusive sexual contact. We reassess the sentence to the sentence approved by the convening authority. The findings, as modified, and the sentence, as reassessed, are correct in law and fact, and no error materially prejudicial to the substantial rights of the appellant occurred. Articles 59(a) and 66(c), UCMJ. Accordingly, the findings, as modified, and the sentence, as reassessed, are **AFFIRMED**.

FOR THE COURT

LEAH M. CALAHAN
Clerk of the Court